UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LYNETTE BASON,

                Plaintiff,                            Case Number 25-10181

v.                                         Honorable David M. Lawson

VILLAGE SQUARE CONSUMER HOUSING
COOPERATIVE and KIRKPATRICK
MANAGEMENT COMPANY,

                Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Lynette Bason alleges that she was constructively discharged from her job as a property manager for the Village Square housing cooperative and the Kirkpatrick Management Company in violation of state and federal antidiscrimination laws. She says that those entities turned a blind eye to the intolerable racial harassment she had to endure during her employment, and that they retaliated against her when she sought relief from those hostile working conditions. The defendants have moved for summary judgment on all of her claims. The Court heard oral argument on the motions on June 25, 2026. The record does not support Bason's claims for retaliation, but material fact questions require that her other claims be decided by a jury. Therefore, the motions for summary judgment will be granted in part and denied in part.

I.

Defendant Village Square is a housing cooperative comprised of 342 dwelling units in Utica, Michigan. Village Square is organized as a nonprofit corporation in which each resident owns a coequal share. The corporation is governed by a board of directors elected by the residents.

Defendant Kirkpatrick is a property-management company that manages 350 properties, including ten in Michigan.  According to Kirkpatrick's senior vice president Valerie Hall, Village Square, as the "Owner," and Kirkpatrick, as the "Agent," entered into a management agreement in 2007 for property management services.  Dep. of Valerie Hall, ECF No. 58-6, PageID.2017; *see* Management Agreement, ECF 45-2. The agreement contemplates that employees, including property managers, will be "hired, paid, supervised, and discharged" through Kirkpatrick, but are deemed to be "employees of the property."  Management Agreement, ECF 45-2, PageID.799.

Plaintiff Lynette Bason was hired as Village Square's property manager in 2019, and she worked at the property until she resigned in 2024.  It appears that both Village Square and Kirkpatrick had control over certain aspects of Bason's employment.  Kirkpatrick was responsible for supervising Bason's day-to-day activities, but Village Square's board retained the ability to assign specific tasks to Bason.  Hall dep., ECF No. 58-6, PageID.2024-25; Dep. of Lynette Bason, ECF No. 45-4, PageID.960-61.  The board was responsible for approving Bason's compensation, including pay raises, and it set Bason's working hours.  Hall dep., ECF No. 58-6, PageID.2024-25.  Hall recalls that Village Square had the authority to suspend or fire Bason without Kirpatrick's input, *id.* at PageID.2024, although board member Sue Usiondek testified that the board did not have input on hiring and firing decisions, Dep. of Sue Usiondek, ECF No. 58-5, PageID.1968.  Kirkpatrick was the employer listed on Bason's tax documents (although her testimony is a bit equivocal on this point, and the parties have not submitted the actual W-2 forms).  Bason dep., ECF No. 45-4, PageID.956-59.  Bason considered herself to be employed by both defendants.  *Id.* at PageID.955.

- 2 -

Bason testified that she was subject to racial slurs and other offensive conduct during her tenure at Village Square. Because the chronology of some of the events is somewhat unclear, the incidents are described episodically.

**(1) The parking incident**. Within a year after Bason started working at Village Square, a resident's father called her a "nigger bitch" during a dispute about a parking violation. Bason dep., ECF No. 45-4, PageID.850-51; ECF No. 43-4, PageID.679. She complained about the event to the board and gave the board the resident's address. ECF No. 45-4, PageID.850-51. Hall recalls that Bason described in the incident as "no big deal," ECF No. 58-6, PageID.2010, although Bason disputes this, Bason dep., ECF No. 45-4, PageID.996-97. In any event, Hall sent a letter to the resident stating that such behavior would not be tolerated. Hall dep., ECF No. 58-6, PageID.2010.

**(2) Racially derogatory statements from residents**. Bason testified that a resident named Carol Napolitano called her a "black bitch." ECF No. 45-4, PageID.850. Carol Cook, another resident, called Bason a "drug dealer," which Bason perceived to be a racial insult. *Id.* at PageID.849, 851-52. And resident Genevieve Mckeehan called Bason a "black monkey" and used other racially offensive rhetoric "[m]ore than ten" times when calling Bason's office. *Id.* at PageID.964-65. Mckeehan's conduct is corroborated by an affidavit from Bason's coworker, Tina Warren, stating that Mckeehan "repeatedly called the office asking, '[w]here's the black monkey at?'" ECF No. 54-3, PageID.1818. Bason testified that she complained about the calls to Hall and the board every time they occurred. ECF No. 45-4, PageID.964-65. She also recalls that Mckeehan "told me I have the property looking like the ghetto." ECF No. 43-4, PageID.680. Mckeehan was not reprimanded for this conduct by Kirkpatrick or the board. ECF No. 45-4, PageID.961-62.

**(3) Racially derogatory statements from board members**. Bason testified that board member Kathy Barry screamed at her, called her a "black bitch," and told her to "shut the F up" during a monthly board meeting. *Id.* at PageID.853. Bason mentioned this to Hall, who brought the concern to the board and its then-president, Sue Usiondek. *Id.* at PageID.853-54. Yet, on another occasion, Usiondek herself called Bason a "black bitch." *Id.* at 854. Moreover, Usiondek sent a letter to the Village Square community accusing Bason of trespassing in residents' homes. *Id.* at PageID.854-56. Bason considered the accusation to be racially motivated in light of the fact that Usiondek called her a "black bitch." *Id.* at PageID.854-55. Bason also testified that Usiondek called her the "N word." *Id.* at PageID.854. However, Bason testified in an earlier session of her deposition that none of the board members used that particular epithet. ECF No. 43-4, PageID.679.

**(4) The lawn jockey statue**. In August 2023, Bason texted Hall about a lawn jockey statue on a resident's property. Bason understood the statue to be associated with the "Jim Crow" era of racial segregation. Upon receiving Bason's text, Hall responded "I think it has racial undertones to it. Let me investigate." ECF No. 54-2, PageID.1813. Hall later sent Bason a *USA Today* article titled, "Fact check: Black lawn jockey history tied to Jim Crow South, not Underground Railroad." *Id.* at PageID.1814. Bason told Hall that the statue needed to be removed. ECF No. 45-4, PageID.903. Bason recalls that Kirkpatrick's then-attorney was also very upset about the statue and wanted it to be removed. *Ibid*. She asked Hall to speak to the owner of the statue, *id.* at PageID.904, but Hall apparently did not. Hall herself recalls that her actions in response to the statue were limited to researching the history of lawn jockey statues and discussing the matter with Bason, Hall dep., ECF No. 58-6, PageID.2027. Bason showed the statue to two or three board members, but the board took no action regarding the statue. Bason dep., ECF No. 45-4, PageID.905-06, 81-82.

**(5) The Facebook page**.  Resident Randy Napolitano — husband of the aforementioned Carol Napolitano — made comments in a Facebook group post asking why Bason had days off for Martin Luther King Day and Juneteenth.  *Id.* at PageID.857.  Bason complained about the Facebook posts to Hall through text messages and phone calls and reported the matter in writing to the board.  ECF No. 45-4, PageID.914-15.

**(6) The black Sharpie incident**.  Bason describes an incident in which her name, along with the names of several other property managers, was written on a garage wall, and someone had crossed her name out with a large black marker.  *Id.* at PageID.920-21.  It is unknown who did this or for what purpose, but Bason believed that it was racially motivated because a black marker was used.  *Id.* at PageID.921.

Bason's rendition of these events is disputed by other witnesses.  Hall, Bason's supervisor, denies knowledge of much of the racial harassment and denies that Bason complained about any of it until a letter Bason sent in March 2024.  Hall dep., ECF No. 58-6, PageID.2010, 2014.  She maintains that the parking incident that occurred early in Bason's tenure was the only time Bason mentioned racial slurs to her, and she said that Bason brushed it off as "no big deal."  *Id.* at PageID.2010.  Board member Usiondek denies referring to Bason using racial epithets, Usiondek dep., ECF No. 58-5, PageID.1971, and board member Kathy Barry testified that Bason was "lying" when Bason accused Barry of yelling at Bason and calling her racial epithets.  Dep. of Kathy Barry, ECF No. 45-7, PageID.1269.

On March 5, 2024, both Bason and Warren sent letters addressed to "Management" and the board of directors complaining about their working conditions.  Bason wrote, "This past year has been one of the most negative and stressful for me and the entire staff."  ECF No. 54-5, PageID.1835.  She disclosed in the letter that she had suffered a massive heart attack in February

2024, and she "realize[d]" upon returning to work that "KB [Kathy Barry] and Genivieve McKennan [sic] are my triggers here. I prefer to stay away from them and MY LIFE DEPENDS ON IT!" *Id.* at PageID.1836. She also requested that Mckeehan "put all requests in writing" because Bason "d[id] not want her calling the office anymore with her rude racist comments." *Ibid.* Warren's letter also complained of rising tensions between residents and staff; she alluded to "numerous calls letting me know about another member's yard area and that it looks 'Ghetto,'" which she perceived to be on the "racist borderline." ECF No. 54-4, PageID.1833.

After Hall received Bason's letter, she waited until the next board meeting to see how the board would respond. Hall Dep., ECF No. 58-6, PageID.2022. The letter was discussed at a board meeting in May 2024. *Ibid.* The residents present at the meeting made sympathetic remarks, but the board took no action in response to the letter. *Ibid.* Once it became clear that the board would not act, Hall took Bason and Warren to an off-site office "for a few days" to get them away from the property. *Ibid.*

Hall sent an email to board members on July 13, 2024 to advise them that both Bason and Warren had filed EEOC complaints alleging discrimination and a hostile work environment. ECF No. 54-6, PageID.1838.

A few days later, on July 16, 2024, Hall sent a letter to Village Square residents regarding the hostility that Kirkpatrick staff members were receiving from certain residents and board members:

> What is happening at Village Square is an absolute travesty and I can no longer remain silent. I have told myself, more times than I can count, remain professional Val – and I mistook my silence as professionalism. For this, I owe you an apology and I do apologize.

ECF No. 45-10, PageID.1353. The letter alluded to a "constant barrage of harassment and negativity" that had "destroyed staff morale." *Ibid.* The letter further acknowledged that "[t]he

- 6 -

Property Manager [i.e., Bason] has been subject to racial slurs and discriminatory comments." *Ibid.* Hall insinuated that much of the recent tensions were driven by board members, and she closed with a call for residents to "demand better of your representation." *Id.* at PageID.1353-54.

Bason ultimately resigned at the advice of her cardiologist and her therapist. Bason Dep., ECF No. 45-4, PageID.937-38. The precise date of her resignation is unclear, although the complaint alleges that Bason was constructively discharged on July 23, 2024, and Kirkpatrick sent an email announcing her resignation on July 25, 2024. *Id.* at PageID.984-87. Shortly afterward, Village Square terminated its contract with Kirkpatrick. Hall dep., ECF No. 58-6, PageID.2011.

Bason and Warren filed a complaint on January 17, 2025, asserting claims for discrimination, retaliation, and hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and Michigan's Elliot Larsen Civil Rights Act (ELCRA). Bason later filed an amended complaint that no longer included claims asserted on Warren's behalf. The Court then partially granted a motion for judgment on the pleadings filed by Kirkpatrick and dismissed Bason's Title VII claims against Kirkpatrick because she had failed to exhaust her administrative remedies. The parties later stipulated to dismiss Bason's Title VII claims against Village Square. So, the only remaining claims are those asserted under Section 1981 and ELCRA.

Kirkpatrick and Village Square filed motions for summary judgment on the remaining claims.

II.

The parties agree on the procedural framework. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party,

and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute.  *Alexander*, 576 F.3d at 558 (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Ibid.*  (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

A.  Employer Status

An undercurrent found in both motions is an argument disputing that one defendant or the other was Bason's employer.  For the state law claims, an "employer" is "a person that has 1 or more employees . . . includ[ing] an agent of that person."  Mich. Comp. Laws § 37.2201(a).  The relevant federal statute, 42 U.S.C. § 1981, is not expressly directed to employment claims, but it protects the right to "make and enforce contracts," *id.* § 1981(a), which has been read to encompass employment claims, *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975).  Although the Sixth Circuit has not ruled on the issue expressly, "[e]very appellate court that has examined the legislative history of 42 U.S.C. § 1981, as amended in 1991[,] has concluded that Congress intended the term 'contract' to encompass at-will employment . . . ."  *Ferrer v. Detroit Club Mgmt. Corp.*, No. 22-11427, 2024 WL 4642754, at *8 (E.D. Mich. Oct. 31, 2024) (quotation

omitted); *Doe v. Matthew 25, Inc.*, 322 F. Supp. 3d 843, 855 (M.D. Tenn. 2018) (collecting cases); *see also Burton v. Plastics Rsch. Corp.*, 134 F. Supp. 2d 881, 886-87 (E.D. Mich. 2001) (concluding that "at-will employment relationships are sufficiently contractual" under Michigan law to support race-discrimination claims under section 1981).

An entity that is not the plaintiff's formal employer still may be liable under federal employment laws as a "joint employer." *See Nethery v. Quality Care Invs., L.P.*, 814 F. App'x 97, 102-03 (6th Cir. 2020); *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 790 (7th Cir. 2019) (observing that joint employer doctrine applies to section 1983 claims). "Entities are joint employers if they 'share or co-determine those matters governing essential terms and conditions of employment.'" *E.E.O.C. v. Skanska USA Bldg., Inc.*, 550 F. App'x 253, 256 (6th Cir. 2013) (quoting *Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir. 1985)). "To determine whether an entity is the plaintiff's joint employer" the Court must consider its "ability to hire, fire or discipline employees, affect their compensation and benefits, and direct and supervise their performance." *Ibid.* (citation omitted).

Michigan courts do not formally recognize a "joint employer" theory under ELCRA, but they apply a similar analysis. Michigan courts have observed that "the plain language of [ELCRA] does not limit employment discrimination claims to employees." *City of Wayne v. Miller*, --- N.W.3d ---, 351 Mich. App. 538, 549 (2024). Instead, "a worker is entitled to bring an action against a nonemployer defendant if the worker can establish that the defendant affected or controlled a term, condition, or privilege of the worker's employment." *Ibid.* (quoting *McClements v. Ford Motor Co.*, 473 Mich. 373, 389, 702 N.W.2d 166, 174-75 (2005)). To determine whether the non-employer "control[s] a term, condition, or privilege" of the worker's employment, courts assess the entity's degree of control over hiring, firing, discipline, compensation, and employee

supervision.  *See, e.g.*, *McClements*, 473 Mich. at 389-90, 702 N.W.2d at 175 (finding that "plaintiff has failed to establish that defendant affected or controlled a term, condition, or privilege of her employment" because she "was hired, paid, and subject to discipline by" an entity other than the defendant); *Luvene v. Pro Carpentry, LLC*, No. 368385, 2025 WL 1702296, at *3 (Mich. Ct. App. June 17, 2025) (holding that plaintiff could sue non-employer defendant under ELCRA where the defendant "hired and paid [the] plaintiff," "dictated [the] plaintiff's job duties and the conditions of his work," and had authority to terminate the plaintiff).  Therefore, an entity that is a worker's "joint employer" for the purposes of Title VII or Section 1981 would also be subject to liability under ELCRA.

The record contains evidence that both defendants exercised control over Bason's activities, compensation, and discipline.  The management agreement between Kirkpatrick and Village Square states that "[a]ll on-site personnel will be employees of the property," but "they will be hired, paid, supervised, and discharged through [Kirkpatrick]."  ECF No. 45-2, PageID.799.  Employees were "paid under Kirkpatrick Management's EIN number," but Village Square reimbursed Kirkpatrick for the payments.  Hall dep., ECF No. 58-6, PageID.2033-34.  Hall approved Bason's time-off requests, but Village Square set Bason's working hours.  *Id.* at PageID.2025.  Hall testified that Kirkpatrick's hiring, termination, and demotion decisions were subject to board approval, *id.* at PageID.2031, but board member Sue Usiondek testified that the board had no involvement in hiring and firing, ECF No. 58-5, PageID.1968.  Similarly, Hall recalled that the board had the "ultimate authority" over disciplinary decisions, ECF No. 58-6, PageID.2023, but Usiondek testified that the board was not involved in disciplining Kirkpatrick employees, ECF No. 58-5, PageID.1968.  However, Hall and board member Kathy Barry agree that the board was responsible for approving pay increases for property staff.  Hall dep., ECF No.

- 10 -

58-6, PageID.2024; Barry dep., ECF No. 45-7, PageID.1289.  And both Bason and Hall testified that Hall was responsible for supervising Bason's day-to-day activities, while the board retained authority to assign her specific tasks.  Bason dep., ECF No. 45-4, PageID.960-61; Hall Dep. ECF No. 58-6, PageID.2024-25.

Although it appears that Kirkpatrick was Bason's formal employer (at least for tax purposes), there is sufficient evidence in the record for a reasonable jury to conclude that Village Square exercised sufficient control over Bason's activities to qualify as a joint employer. Therefore, she may pursue her viable claims against both defendants at trial.

Nevertheless, Village Square argus that it "does not meet the criteria of an 'employer' under 42 U.S.C. §2000e since it had less than fifteen (15) employees." ECF No. 58, PageID.1889. It is unclear why Village Square makes this argument, since section 2000e provides the definition of "employer" for Title VII actions, and the Court already dismissed all of the plaintiff's Title VII claims.  If Village Square means to argue that it is not liable on Bason's non-Title VII claims because it employs fewer than 15 people, it is incorrect.  Although the same standards often apply to Title VII and section 1981 claims, the 15-employee limitation in Title VII does not apply to section 1981.  *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 304 n.3 (1994).  And ELCRA only requires that an "employer" have one or more employees.  Mich. Comp. Laws § 37.2201(a).

### B.  Hostile Work Environment Claim

In her amended complaint, Bason alleges that both defendants discriminated against her on account of her race by creating a hostile work environment in violation of 42 U.S.C. § 1981 and Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.*  Both defendants argue that the record does not support those claims.

Section 1981 guarantees the right of "[a]ll persons within the jurisdiction of the United States . . . to make and enforce contracts," that is, "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a), (b). The Michigan statute makes it unlawful for an employer to discriminate against an employee "because of religion, race, color, national origin, age, sex, sexual orientation, gender identity or expression, height, weight, familial status, or marital status." Mich. Comp. Laws Ann. § 37.2102(1). Both statutes "provide a cause of action for racial harassment in the work place." *Jackson v. Quanex Corp.*, 191 F.3d 647, 657 (6th Cir. 1999). Creating or tolerating a hostile work environment is a species of discrimination that is illegal. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (evaluating a discrimination claim under Title VII). Employment-related claims under Title VII, section 1981, and ELCRA generally are assessed under the same standards. *See, e.g.*, *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018); *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020); *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 n.4 (6th Cir. 2011).

To establish discrimination under a hostile work environment theory, the plaintiff must offer evidence that "(1) [she] was a member of a protected class; (2) [she] was subjected to unwelcome harassment; (3) the harassment was based on [her class membership]; (4) the harassment unreasonably interfered with [her] work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable." *Smith v. P.A.M. Transp., Inc.*, 154 F.4th 375, 382-83 (6th Cir. 2025) (cleaned up); *Quinto v. Cross & Peters Co.*, 451 Mich. 358, 368-69; 547 N.W.2d 314, 319-20 (1996). These same elements apply to claims of harassment based on either sex or race. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002) ("Hostile work environment claims based on racial harassment are reviewed under the same

standard as those based on sexual harassment.") (citing *Faragher v. Boca Raton*, 524 U.S. 775, 786-87 & n. 1 (1998) and *Meritor Sav. Bank*, 477 U.S. at 66-67).

The evidence plainly establishes the first element, and the defendants do not contest that point. But elements two through four are not conceded, and the defendants vigorously argue that the record cannot support the fifth element.

### 1. Elements Two Through Four

As for elements two, three, and four, there is extensive evidence of race-based harassment from which a jury could find a hostile work environment. "A plaintiff may show that unwelcome harassment occurred and was based on race, and thereby satisfy the second and third elements, by adducing evidence of the use of race-specific and derogatory terms, or comparative evidence of how the alleged harassers treated members of both races in a mixed-race workplace." *Smith*, 154 F.4th at 383 (citation omitted). Bason testified that she repeatedly was subjected to racist insults during her tenure at Village Square. For instance, she recalls that one Village Square resident called her a "nigger bitch." Bason dep., ECF No. 45-4, PageID.850. Resident Genevieve Mckeehan called Bason a "black monkey" or used other racially offense rhetoric "[m]ore than ten times" when calling Bason's office. *Id.* at PageID.964-65. Board member Kathy Barry screamed at her, called her a "black bitch," and told her to "shut the F up." ECF No. 45-4, PageID.853. Board member Sue Usiondek also called her a "black bitch." *Id.* at PageID.854. The repeated use of these racialized insults provide ample evidence of unwelcome harassment based on race. *See, e.g*, *Smith*, 154 F.4th at 383-84 ("[C]ircuit courts, including our circuit, have overwhelmingly held that the use of the term 'monkey' against an African American employee constitutes evidence of race-based harassment sufficient to support a hostile work environment claim."); *Johnson v.*

*United Parcel Serv., Inc.*, 117 F. App'x 444, 454 (6th Cir. 2004) ("Case law makes clear that the use of the word 'nigger,' even taken in isolation, is not a 'mere offensive utterance.'").

The "discriminatory nature" of workplace conduct is "necessarily dependent on the 'social context in which particular behavior occurs and is experienced by its target.'" *Smith*, 154 F.4th at 384 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998)). The record contains evidence of other, less overtly racist incidents that nonetheless could be perceived in context as racially hostile or abusive. For instance, many Americans perceive "lawn jockeys" of the kind Bason saw on a resident's yard as racist and associate them with the Jim Crow era of racial discrimination. *E.g.*, Lawn Jockey Echoes Nation's Complex History, NBC News (Sept. 16, 2006, 10:56 AM), https://www.nbcnews.com/id/wbna14868607 ("To some the lawn jockey is a pint-size monument to repugnant stereotypes, a holdover from the days of slavery and Jim Crow. But others, including some historians and collectors of African American memorabilia, say the lawn jockey has been misunderstood."). Bason testified that Usiondek falsely accused her of being a trespasser, which is not necessarily racially derogatory by itself, but could be construed as racist in light of stereotypes associating African Americans with crime and Usiondek's having allegedly called Bason a "black bitch." ECF No. 45-4, PageID.854-55; *see Smith*, 154 F.4th at 388 ("[F]acially neutral abusive conduct can support a finding of . . . animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly . . . discriminatory conduct.'" (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 596 (6th Cir. 2006)). Bason also was aware of a Facebook page operated by some of the residents containing some comments that could be construed as racially motivated, such as comments questioning why Bason was given days off for Martin Luther King Day and Juneteenth. ECF No. 45-4, PageID.857.

- 14 -

Evidence supports the fourth element as well. "Whether harassment is sufficiently severe or pervasive to create an abusive work environment is quintessentially a question of fact." *McNeal v. City of Blue Ash, Ohio*, 117 F.4th 887, 904 (6th Cir. 2024) (quotation omitted). The Court considers "the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Ibid.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)). The plaintiff need not show that the harassment "seriously affected her psychological well being or caused her to suffer injury" if it "would reasonably be perceived . . . as hostile or abusive." *Ibid.* (cleaned up).

Nonetheless, the record contains evidence that the work environment significantly affected Bason's wellbeing. In the letter she sent to the board on March 5, 2023, Bason stated that interacting with "KB" (presumably Kathy Barry) had "physically and mentally bothered" her, and hostility from board members had affected her and other staff members' performance. ECF No. 54-5, PageID.1835. She testified that the stress from working at Village Square ultimately caused her to resign at the advice of her doctor and her therapist. Bason dep., ECF No. 45-4, PageID.937-38. Taken together, the slurs, insults, and harassment that Bason allegedly faced could lead a jury to find that she was subject to a hostile and abusive work environment.

2. Employer Liability (Fifth Element)

The defendants argue, however, that even if all that is true, the conduct cannot be attributable to them, and therefore the record does not establish the fifth element. That element depends on the "status of the harasser." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 412 (6th Cir. 2021).

- 15 -

An employer is directly liable for actions taken by certain high-level officials, such as "owners, partners, proprietors, corporate officers, and some high-level managers." *Bivens v. Zep, Inc.*, 147 F.4th 635, 642 (6th Cir. 2025) (citing *Faragher*, 524 U.S. at 789-90).  The organization also is strictly liable for the conduct of supervisors when they take a "tangible employment action" against the victim, such as firing the employee, docking her pay, or demoting her.  *Id.* at 644 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761-62 (1998)).  But when the harasser is a coworker, the plaintiff "must establish that the employer acted negligently in failing to prevent the abuse."  *Hamm v. Pullman SST, Inc.*, 167 F.4th 382, 389 (6th Cir. 2026) (citation omitted).  This "negligence" standard requires the plaintiff to show that the employer "knew or should have known about the [harassing] conduct and failed to stop it."  *Ellerth*, 524 U.S. at 759.

Another standard applies for an organization's clients and customers.  Although the EEOC and nearly every other circuit to consider the issue has concluded that the same negligence standard applicable to coworker harassment also applies to harassment by non-employees, the Sixth Circuit recently held that an employer is "liabl[e] for non-employee harassment only where the employer *intends* for the harassment to occur."  *Bivens*, 147 F.4th at 645-46 (emphasis added).  The plaintiff may satisfy this "intent" standard by showing that the employer either "'desire[d] to cause' her harassment or was 'substantially certain' that it would 'result from' its actions."  *Id.* at 645 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 n.3 (2011)).

### a.  Kirkpatrick

It is undisputed that neither Hall nor any other employee of Kirkpatrick personally engaged in any of the racially offensive conduct described above.  Therefore, under *Bivens*, Kirkpatrick can only be liable for the racially hostile conduct if it "*intentionally* created or tolerated unequal working conditions."  *Bivens*, 147 F.4th at 645 (quoting *Dunn v. Washington County Hospital*, 429

- 16 -

F.3d 689, 691-92 (7th Cir. 2005)).  Bason must show that Kirkpatrick "either 'desire[d] to cause' her harassment or was 'substantially certain' that it would 'result from' its actions."  *Id.* at 645 (quoting *Staub*, 562 U.S. at 422 n.3).  Bason does not suggest that Kirkpatrick "desire[d] to cause" her to be harassed by Village Square's board members and residents, but the evidence does support a claim that Kirkpatrick was "substantially certain" that the harassing acts would occur (or at least continue), *ibid.*, and failed to take adequate measures to stop it.

*Bivens*'s "substantially certain" test is meant to measure the employer's level of tolerance of non-employee harassing conduct and gauge when it crosses the line into intentional harassment of an employee exposed to it.  That formulation of the test is drawn from Judge Easterbrook's opinion in *Dunn*, which "lay[ed] out the correct intent standard" and "provides a handy blueprint for how to apply it."  *Bivens*, 147 F.4th at 645 (citing *Dunn*, 429 F.3d at 690-91).  In *Dunn*, a female nurse sued her hospital employer for sexual harassment by a staff physician who was an independent contractor.  429 F.3d at 690-91.  Explaining why the hospital could be liable for the non-employee's conduct, Judge Easterbrook provided this example:

> Suppose a patient kept a macaw in his room, that the bird bit and scratched women but not men, and that the Hospital did nothing.  The Hospital would be responsible for the decision to expose women to the working conditions affected by the macaw, even though the bird (a) was not an employee, and (b) could not be controlled by reasoning or sanctions.  It would be the Hospital's responsibility to protect its female employees by excluding the offending bird from its premises.

*Id.* at 691.  In same way, the hospital could be liable if it "knew that [the doctor] made life miserable for women (but not men) and did nothing in response."  *Ibid.*  Or, as *Bivens* framed it, "the hospital was 'substantially certain' the harassment would keep happening if it continued to allow the physician staff privileges, but opted not to change course."  *Bivens*, 147 F.4th at 645 (quoting *Staub*, 562 U.S. at 422 n.3).

In this case, the evidence suggests that there was not a single macaw but rather a flock of them.   A jury easily could conclude that Kirkpatrick intentionally exposed Bason to an environment in which it was substantially certain that racial harassment would occur.   Bason testified that she repeatedly complained to Hall about her treatment, verbally and in writing, starting as early as 2019.  ECF No. 45-4, PageID.832.  Once Kirkpatrick, through Hall, knew about Village Square and the residents' racially offensive behavior, it had a duty to take remedial measures to ensure that Bason was not exposed to the conduct.  *See Dunn*, 429 F.3d at 691 ("The employer's responsibility is to provide its employees with nondiscriminatory working conditions. The genesis of inequality matters not; what *does* matter is how the employer handles the problem.").  The only remedial actions that Kirkpatrick identifies are (1) sending a letter to the resident associated with the N-word/parking incident in 2021, (2) taking Bason and Warren off-site for a few days after they submitted their complaint letters in March 2024, and (3) Hall's July 16, 2024 letter to the Village Square residents in which she apologized for not doing more and urged the membership to address the intolerable behavior.  ECF No. 55, PageID.1855-56.

Were these interventions enough to stanch a finding that that racial harassment would continue?  A jury could conclude that they were not.  If the parking incident were the only time Bason was called a racial slur, as Hall testified, *see* ECF No. 58-6, PageID.2010, then a letter might have been enough under circumstances.  But according to Bason's testimony — which the Court must take as true at this stage of the case — the racial harassment continued after that.  Although the timeline is somewhat unclear, Bason testified that the harassment worsened in 2022 and 2023, and she submitted multiple written complaints about it.  ECF No. 45-4, PageID.861.  And even Hall acknowledges receiving Bason's March 2024 letter, which expressly referenced racially hostile comments from Mckeehan and her discomfort with working for Kathy Barry.  Hall Dep.,

ECF No. 58-6, PageID.2022; *see* 3/5/24 Letter, ECF No. 54-5. Yet Hall waited until a board meeting that occurred two months later in May 2024 to address the matter and only took Bason off-site temporarily ("a few days") once it became clear the board would do nothing. Hall dep., ECF No. 58-6, PageID.2022. Another two months passed before Hall sent the letter to Village Square residents in mid-July 2024. ECF No. 45-10. There is no suggestion in the record that these actions mitigated the harassment. A jury could find that the harassment was substantially certain to continue notwithstanding these interventions.

Kirkpatrick had limited tools at its disposal to deal with the harassment Bason faced. As a management company, it could not evict unilaterally a resident or unseat a board member who hurled racial insults at Bason. But Kirkpatrick has not shown that Hall's actions were the only ones that she could have taken to remediate the harassment. For instance, it is unclear why Kirkpatrick could not have offered to transfer Bason to one of its other properties. It also seems plausible that Hall could have advocated for better treatment for Bason more promptly or more forcefully than she actually did.

Bason has offered sufficient evidence on the fifth element — employer liability — to create a fact question that precludes summary judgment in favor of defendant Kirkpatrick.

### b. Village Square

The same is true for Village Square. Bason may not have to rely on *Bivens*'s "substantially certain" intent standard, at least for some of Village Square's conduct, since Bason alleges that some of the racial insults came from Village Square's board members. *See Bivens*, 147 F.4th at 642 (recognizing that employers are directly liable for the conduct of "some high-level managers"). But the evidence satisfies the "substantially certain" test as to Village Square anyway. Bason testified that she repeatedly complained to Village Square's board about the conduct that

contributed to a hostile work environment.  *E.g.*, ECF No. 45-4, PageID.832.  There is no evidence that the board took any action in response to these complaints.  Since the board had notice of the racially offensive conduct and apparently did nothing to stop it, a jury reasonably could conclude that the racially harassing conduct was substantially certain to continue.

* * * * *

There is a question of fact as to whether Village Square and Kirkpatrick intended for the racial harassment to continue.  The motions for summary judgment on the hostile work environment claims will be denied.

### C.  Discrimination Claim

Bason also complains that the defendants discriminated against her on the basis of race by denying her access to work in the new office building, falsely accusing her of trespassing into one of the units, "micromanag[ing] and subject[ing her] to a relentless campaign of demands," and constructively discharging her.  ECF No. 60, PageID.2095.

Again, discrimination claims under section 1981 and ELCRA are subject to the same evidentiary standards as Title VII claims.  *Rogers*, 897 F.3d at 771 (collecting cases).  The plaintiff may prove her claims with direct or circumstantial evidence.  *Ibid.*  "Direct evidence, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Shazor v. Pro. Transit Mgmt., Ltd.*, 744 F.3d 948, 955 (6th Cir. 2014) (quotation omitted).  "Evidence of discrimination is not considered direct evidence unless a[n improper] motivation is explicitly expressed." *Amini v. Oberlin College,* 440 F.3d 350, 359 (6th Cir. 2006).  The record here does not support a discrimination claim based on direct evidence.

Discrimination claims based on circumstantial evidence are evaluated under the familiar *McDonnell Douglas* burden-shifting framework.  *Moore v. Coca-Cola Bottling Co. Consol.*, 113

F.4th 608, 622 (6th Cir. 2024).  First, "the plaintiff bears the 'initial burden' of 'establishing a prima facie case' by producing enough evidence to support an inference of discriminatory motive." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308 (2025) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  "To make out this prima facie case, the plaintiff must show that [s]he was (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) replaced by a person outside the protected class or treated differently than similarly situated nonminority employees." *Moore*, 113 F.4th at 622 (quoting *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016)).

Once the plaintiff makes this *prima facie* case, the burden shifts to the employer to "proffer a nondiscriminatory reason for its actions." *Id.* at 623 (citation omitted).  The burden then shifts back to plaintiff to show pretext by demonstrating that "the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Ibid.* (quotation omitted).  "At the summary-judgment stage, showing that a proffered reason is insufficient requires the employee to show that a 'reasonable factfinder could find that [the employer's] proffered reason was insufficient to motivate [the employee's] discharge.'" *Ibid.* (quoting *Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 676 (6th Cir. 2008)).

Starting with the second element of the *prima facie* case — the first is uncontested — many of the actions Bason describes do not amount to adverse employment actions, since they did not "inflict[] direct economic harm." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (quoting *Ellerth*, 524 U.S. at 762).  However, Bason's evidence of constructive discharge satisfies this component of her *prima facia* case.  *Ibid.*  "A constructive discharge occurs when the employer, rather than acting directly, 'deliberately makes an employee's working conditions so

- 21 -

intolerable that the employee is forced into an involuntary resignation." *Ibid.* (quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987)). The employee must show that "1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." *Id.* at 728 (citations omitted). A plaintiff who has established a hostile work environment may prove a constructive discharge based on that environment by showing that "working conditions [were] so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004).

The record evidence of a racially hostile work environment also shows that conditions were sufficiently severe that a reasonable person in Bason's position would resign. *See Lee v. Cleveland Clinic Found.*, 676 F. App'x 488, 496 (6th Cir. 2017) (finding that coworker's "overt comments that clearly concern Plaintiff's race and national origin," combined with management's failure to investigate the plaintiff's complaints, created a question of fact "as to whether these comments constituted harassment and humiliation strong enough to compel resignation and whether any failure to investigate contributed to a constructive discharge"). Additionally, the Village Square board members' alleged derogatory remarks, along with both defendants' alleged failure to investigate or otherwise address her complaints, would permit a jury to conclude that either defendant intended for Bason to quit. *See ibid.* ("A reasonable juror could further find that CCF intended not to investigate Plaintiff's claims of age, race, and national origin discrimination because it wanted Plaintiff to leave her job."). Bason has put forward sufficient evidence to satisfy the second element of a discrimination claim based upon the alleged constructive discharge.

Bason also has satisfied her burden on elements three and four. The defendants do not dispute that Bason was qualified for her job. *See Moore*, 113 F.4th at 622. And Tina Warren,

Bason's white coworker, has submitted an affidavit stating that she was not subject to similar race-based harassment.  ECF No. 54-3, PageID.1828.  Bason has established a *prima facie* case of discrimination.

Village Square does not offer any evidence of a legitimate, non-discriminatory reason for the adverse employment action.  Kirkpatrick argues that Bason's position was eliminated in connection with Village Square's decision to terminate its management contract with Kirkpatrick.  But Bason had resigned by the end of July 2024, *see* Bason dep. ECF No. 45-4, PageID.984-87; Kirkpatrick continued to provide services until the end of August, Hall dep., ECF No. 58-6, PageID.2011.  The conduct that led to Bason's resignation cannot be attributed to a contract cancellation that occurred *after* her resignation.

Because neither defendant has met its burden on the second part of the *McDonnel-Douglas* protocol, pretext is not an issue that plays a role in the summary judgment decision.  The motions will be denied as to the discrimination claims.

### D.  Retaliation

Bason contends that Kirkpatrick retaliated against her for filing an EEOC complaint when the board made false accusations against her for trespassing, the defendants subjected her to increased micromanagement, and she was excluded from a new office building on the property.  She says that Village Square did the same after she complained to the board about racially hostile conduct.

Both section 1981 and ELCRA prohibit an employer from retaliating against an employee for opposing or complaining about racial discrimination.  *Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 500 (6th Cir. 2013); *Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 831 (E.D. Mich. 2009).  A similar burden-shifting format applies when evaluating a circumstantial retaliation

- 23 -

case at the summary judgment stage.  *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 996 (6th Cir. 2009).

To establish a *prima facie* case of retaliation, the plaintiff must demonstrate that: "(1) [s]he engaged in protected activity, (2) the activity was known to the defendant, (3) the plaintiff was subjected to a materially adverse action, and (4) there was a causal connection between the protected activity and the adverse action."  *Herrera*, 545 F. App'x at 501.

The first and second elements of Bason's *prima facie* retaliation case are satisfied.  Bason testified that she made complaints to the board and to Hall regarding racially offensive statements and conduct she observed.  ECF No. 45-4, PageID.861.  She also submitted a complaint to the EEOC, as referenced in a July 13, 2024 email from Hall to the board.  The complaints about alleged discriminatory statements and conduct constitute protected activity under Section 1981 and ELCRA, satisfying the first element.  *See Herrera*, 545 F. App'x at 500; *Curry*, 669 F. Supp. 2d at 831.  Furthermore, the defendants knew the complaints were made upon receiving them, satisfying the second element.

Bason seeks to satisfy the "adverse action" element of the *prima facie* claim with evidence that the board "made false accusations of illegal trespassing against her, subjected her to increased micromanagement, and excluded her from the new building" in response to her complaints about discriminatory conduct.  ECF No. 54, PageID.1806.  Although these acts were not sufficiently severe to support a discrimination claim, retaliation claims use a more generous criterion for material adversity.  *Laster*, 746 F.3d at 731-72.  Material adversity in the retaliation context requires the plaintiff to show that "the challenged action . . . well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 731 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

The allegations of micromanagement and exclusion from a new building are not especially compelling, even under this more lenient standard. The "micromanagement" evidently consisted of Kathy Barry sitting in Bason's office and "demanding things she's not privy to." Bason dep., ECF No. 45-4, PageID.871. Although annoying, this conduct is not likely to intimidate or otherwise deter a reasonable worker from reporting racial harassment. The same is true of the allegation of exclusion from a remodeled building. This allegation apparently refers to the temporary removal of property staff from an office building while it was being demolished and rebuilt. *See* Hall dep., ECF No. 58-6, PageID.2035-36. Assuming that Bason was denied access to the newly renovated building as a consequence of her protected activity, the denial of one's chosen office space, without more, is not so severe as to prevent a worker from reporting harassment.

However, the false accusations of trespassing are more serious. Hall testified that members of the board falsely accused Bason of trespassing while she was performing unit inspections. ECF No. 58-6, PageID.2016. And Bason testified that allegations of trespassing are (unsurprisingly) damaging to a property manager's professional reputation, and that her current employer would not have hired her if it were aware of the allegations. ECF No. 45-4, PageID.869-70. A reasonable worker easily could be dissuaded from reporting discrimination if she knew that she would be subject to false and career-damaging accusations in response.

However, Bason has not identified sufficient evidence of a causal connection between the protected activity and the retaliatory conduct. She argues that the retaliatory actions occurred in June and July 2024, following Bason's letter to the board in March 2024 and her later EEOC complaint. ECF No. 54, PageID.1806; ECF No. 60, PageID.2091. But she cites no evidence that the alleged retaliatory conduct occurred or escalated within that timeframe, and she points to no

facts other than temporal proximity to establish that these complaints were made because of her protected activity.

"The Sixth Circuit has recognized that a plaintiff may be able to survive summary judgment based on a showing of temporal proximity between the adverse action and the protected activity alone." *Beny v. Univ. of Michigan Bd. of Regents*, 740 F. Supp. 3d 621, 647 (E.D. Mich. 2024) (citing *Bledsoe v. Tennessee Valley Auth. Bd. of Directors*, 42 F.4th 568, 588 (6th Cir. 2022)), *aff'd sub nom. Beny v. Univ. of Michigan*, No. 24-1674, 2025 WL 2124175 (6th Cir. July 29, 2025). But when temporal proximity is the only link, the "adverse action [must] occur[] immediately after the protected activity." *Bledsoe*, 42 F.4th at 588. "[W]hen 'some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.'" *Ibid.* (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).

The record does not demonstrate the immediacy between the alleged adverse activity and Bason's complaints of racial harassment that would allow temporal proximity to carry the causation burden by itself. And Bason has offered no other evidence connecting the adverse actions to her complaints. The failure of proof on this element dooms her retaliation claim.

III.

The record contains sufficient evidence to support the claim that both defendant Village Square Consumer Housing Cooperative and defendant Kirkpatrick Management Company were the plaintiff's employers at the relevant times. Sufficient evidence also supports the plaintiff's claims based on a hostile work environment and discrimination. However, she has not established fact questions on all the elements of her discrimination claim.

- 26 -

- 27 -

Accordingly, it is **ORDERED** that defendants' motions for summary judgment (ECF Nos. 45, 58) are **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Counts III and VIII of the amended complaint alleging unlawful retaliation are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the motions are **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   July 8, 2026